### THOMASON et al. v. McENTIRE et ux.
### (No. 9522.)

(Court of Civil Appeals of Texas. Fort Worth. March 26, 1921. Rehearing Denied May 21, 1921.)

1. Appeal and error ⏂⟹768—Appellant's briefs accepted as a proper presentation of case in absence of reply briefs.

In the absence of reply briefs by appellees, the Court of Civil Appeals is authorized to accept appellant's briefs as a proper presentation of the case, without an examination of the record under court rules 40 and 41 (142 S. W. xiv).

2. Mines and minerals ⏂⟹58—Lessors held entitled to cancellation of lease procured by fraud.

Where oil and gas lease was procured by lessee's promise that he would transfer the lease to a corporation, and where such promise was made by the lessee without the intention to perform it and for the fraudulent purpose of deceiving the lessors, and where the lessors were in fact deceived thereby, the lessors, on the lessee's failure to comply with such promise, were entitled to a cancellation of the lease.

3. Mines and minerals ⏂⟹74 — Purchasers of interest in lease held not innocent purchasers without notice of fraud which had induced execution of lease.

Lessors were entitled to cancellation of fraudulently procured oil and gas lease as against third persons who had purchased interests in lease from the lessee at a time when they knew or by the exercise of reasonable diligence should have known that the lessee had induced the execution of the lease by a promise to transfer lease to a corporation and to give the lessors stock therein, made without the intention to perform the promise, and for the fraudulent purpose of deceiving the lessors; the third persons not being innocent purchasers without notice.

4. Limitation of actions ⏂⟹199(2) — Lessors' discovery that lessee had not transferred lease did not start as matter of law running of limitations against action to cancel for fraud.

Where the lessor was blind and illiterate and had confidence in and trusted the lessee to carry out his promise to transfer the lease to a corporation by which promise lessee had fraudulently induced the lessor to execute the lease without intending to comply therewith, the mere discovery that the lease had not been transferred to the corporation did not as matter of law charge lessor with knowledge of the fraud so as to start the running of the statute of limitations.

---

⏂⟹For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**5. Limitation of actions** ⬥73(3)—**Limitations not available defense against wife suing to cancel lease affecting homestead.**

In a husband and wife's action to cancel oil and gas lease on their homestead, the defense of limitation was not available against the wife by reason of her coverture.

**6. Appeal and error** ⬥1096(3) — **Opinion on prior appeal not conclusive on subsequent appeal as to issue not 'raised during first trial.**

Opinion on former appeal was not conclusive on a subsequent appeal on issue not raised during the first trial.

On Motion for Rehearing.

**7. Mines and minerals** ⬥58—**Evidence held to prove that stock lessee had agreed to give lessors was worthless.**

In lessors' action to cancel oil and gas lease, evidence *held* to prove that corporate stock which lessee had agreed to transfer to lessors was worthless.

Appeal from District Court, Stephens County; W. R. Ely, Judge.

Action by S. J. McEntire and wife against G. J. Thomason, in which G. W. Thomason and another intervened. Judgment for plaintiffs, and defendant and interveners appeal. Affirmed.

See, also, 210 S. W. 563.

H. G. McConnell and E. D. McKenzie, both of Haskell, and Wm. E. Hawkins, of Austin, for appellants.

J. R. Stubblefield, of Eastland, for appellees.

DUNKLIN, J. G. J. Thomason, defendant, and G. W. Thomason and Y. L. Thomason, interveners, have appealed from a judgment in favor of S. J. McEntire and wife, plaintiffs, canceling a certain instrument in writing executed by plaintiffs and alleged to constitute a cloud upon their title to a tract of land situated in Stephens county. That instrument was as follows:

"The State of Texas, County of Stephens:

"Know all men by these presents that we, S. J. McEntire and wife, S. A. McEntire, of Stephens ·county, Tex., the party of the first part, in consideration of the sum of $1.00 paid by G. J. Thomason, party of the second part, the receipt of which is hereby acknowledged, and the further consideration hereinafter mentioned, have granted, bargained, sold, and conveyed, and do by these presents grant, bargain, sell, and convey, unto the parties of the second part their heirs and assigns, all of the coal, oil, and gas and other minerals in and under the following described land, together with the right of ingress and egress at all times for the purpose of drilling, mining, and operating for minerals, and to conduct all operations and to lay all pipes and railway necessary for the production, mining, and the transportation of the coal, oil, gas, water, or other minerals, and shall have the right to remove all machinery, fixtures and improvements placed thereon at any time, reserving, however, to the parties of the first part their proportionate part of cash dividends, which shall be determined by the number of shares of stock owned by them, and such payment made quarterly without demand, said land being described as following, to wit: 160 acres known as S. W. ¼ sec. No. 10, block 7, S. P. Ry. Co. Cert. 17/532, being situated in Stephens county,· Tex., and more particularly described in deed records of said county, containing 160 acres, more or less.

"To have and to hold· the above-described premises unto the said parties of the second part, their heirs and assigns, upon the following conditions: In case operation for either the drilling of a well for coal, oil, gas, or other minerals is not commenced and prosecuted with due diligence within 15 months from this date on the above-described premises on one or more of their leases owned by ·parties of the second part, then the second party agrees to pay to the first party the sum of 10 per cent. per annum on the par value of each dollar of stock owned by first party; it being agreed that the first party is to take shares of the capital stock of Diamond Coal Oil & Gas Company at par value as payment of the above-· named 10 per cent. until such well or shaft is commenced, and it is agreed that the completion of such well or opening up one mine, gas or oil well shall be and operate as a full liquidation of all rental under this provision during the remainder of the term of this lease. Such payment will be made direct to the holder of said stock.

"In case the parties of the second part should bore and discover either coal, oil, gas, or other minerals, then in that event this grant, incumbrance, or conveyance shall be in full force and effect for 20 years from the time of the discovery of said products, and as much longer as. coal, oil, gas, water, or other minerals can be produced in paying quantities thereon. Whenever sales are being made of the' product on the land above described, such sales shall be added to the sales of the product from all leases owned by the parties of the second part, and a settlement thereof shall be made at the end of each quarter.

"And it is further agreed that the second parties, their heirs and assigns, may at any time hereafter surrender up this grant and be relieved from any part of the contract heretofore entered into that may at that time remain unfulfilled. Then and from thereafter this grant shall be null and void, and no longer binding on either party,

"It is understood between the parties to this agreement that all conditions between the parties hereunto shall extend' to their heirs, executors, administrators, and assigns.

"Witness our hands this 18th day of August, A. D. 1909.

"W. R. Power (Witness).

"Heff McEntire (Witness).

his

"S. J. x McEntire.

mark

"S. A. McEntire."

Attached to the instrument is a certificate of a notary in statutory form and sufficient

on its face to bind both grantors, unless the attack made thereon in plaintiffs' pleadings be sustained.

On the same day that plaintiffs executed this instrument G. J. Thomason obtained like instruments covering six other tracts in the same vicinity, owned by persons other than plaintiffs and aggregating 1,566 acres, two of those tracts being owned by M. F. Ham and wife, and later instruments of like character on two other tracts aggregating 593 acres in the same vicinity, the instrument relating to one of those two tracts being dated in October, 1909, and the other dated in May, 1910.

On January 11, 1911, G. J. Thomason executed to his two brothers, G. W. Thomason and Y. L. Thomason, who are interveners herein, a written conveyance of an undivided two-thirds interest in "all the coal, oil, and gas and other minerals in and under" all those nine tracts of land, in the description of which the instruments under which G. J. Thomason claimed and which are mentioned above were specifically referred to; and a cash consideration of $2,400 paid to G. J. Thomason by interveners was recited. That instrument was never filed for record nor acknowledged before a notary public or other officer.

One of the grounds upon which plaintiffs based their suit for cancellation of the instrument was fraud, which it was alleged was practiced upon them by the defendant, G. J. Thomason, and which induced the execution f the instrument. It was alleged, in substance, that prior to the execution of the instrument the defendant represented that a certain corporation known as the Diamond Coal, Oil & Gas Company had large financial assets sufficient to develop the mineral resources, and especially the coal, which it was believed existed in the vicinity of the plaintiffs' land; that, if the people living in that community would execute to him mineral leases on their respective tracts of land, he would thereafter transfer to said corporation each and all of said leases, and in consideration therefor would give to the lessors stock in the corporation on the basis of $5 per acre of the land so leased; that it was the defendant's purpose to build, or have the corporation to build, a railroad in the immediate vicinity of the plaintiffs' land for the purpose of shipping all coal that might be mined, and that the said corporation would have abundant resources to perform all such undertaking. It was further alleged that plaintiffs, relying upon the truthfulness and good faith of said representations, were thereby induced to execute the instrument in controversy; that each and all of said representations were false and were fraudulently made by the defendant to induce the execution of the instrument; that the representations so made by the defendant to

transfer all of said leases to said corporation were made with no intention to perform the same; and that, pursuant to the said fraudulent scheme and intent then moving him, the defendant has never transferred any of said leases to said corporation, but has held and claimed them in his own name and right.

Another ground for cancellation was the alleged abandonment of any and all rights or benefits conveyed by the instrument.

A further ground upon which a cancellation was sought was that the property described in the instrument was the homestead of the plaintiffs at the time the instrument was executed, and that the same was not signed and acknowledged by plaintiff Mrs. McEntire as her voluntary act and deed, in compliance with the statutes in such cases made and provided, and that that fact was known to the defendant at the time the instrument was delivered to him.

It was further alleged that the cash consideration of $1 recited in the instrument was never paid; that while plaintiffs received stock in the corporation at the rate of $5 per acre for the lease on their land, the same was wholly worthless, and that the corporation had never owned any assets whatever; that the defendant did not begin mining operations within the time specified in the instrument, and after beginning the same did not prosecute the same with diligence; and it was further alleged that plaintiff had never received any stock in the corporation as rentals for delay in beginning operations. The truth of all of plaintiffs' allegations were put in issue by the pleadings of the defendant and interveners.

In their pleadings the interveners further alleged that for a valuable consideration paid and without any notice of the fraud alleged in plaintiffs' petition, or of the alleged defective acknowledgment of the instrument, they had purchased from the defendant G. J. Thomason, on January 11, 1911, an undivided two-thirds interest in all the coal, oil, gas, and other minerals in plaintiffs' land.

The defendant also invoked the statutes of limitation of two years and four years as against the plaintiffs' suit.

The case was tried before a jury on special issues, and the following is the substance of the findings so made:

(1) The defendant, G. J. Thomason, by means of fraudulent representations, as alleged by plaintiffs, did induce the plaintiffs to execute the instrument in controversy.

(2) Plaintiffs filed this suit within two years after discovering such fraud and within two years after they could have discovered it by the exercise of reasonable diligence.

(3) The defendant G. J. Thomason, did not, either directly or indirectly, pay to plaintiffs a valuable consideration for the lease in controversy.

(4) The defendant G. J. Thomason did not

begin drilling operation for coal, oil, gas, or other minerals on plaintiffs' land, or any other land on which he took leases, within 15 months from the date of the plaintiffs' lease, and did not prosecute the drilling operations thereafter begun with due diligence.

(5) Neither defendant nor interveners paid to the plaintiffs 10 per cent. of the par value of the stock held by them in the Diamond Coal, Oil & Gas Company, either in money or in stock in said company.

(6) No well was completed nor mine opened upon plaintiffs' land, or any other land leased to defendant in that vicinity, either by defendant or by the interveners.

(7) The land described in plaintiffs' petition was their homestead at the time the instrument in controversy was executed.

(8) Plaintiff Mrs. S. A. McEntire did not sign that instrument willingly.

(9) The mineral contract in controversy was abandoned by both defendant and interveners.

(10) The defendant and the interveners all abandoned the rights, if any they had, to the land in controversy.

The following were additional special issues requested by the interveners, with the findings of the jury thereon:

"Did G. W. Thomason, in January, 1911, purchase from G. J. Thomason one-third of the minerals conveyed by the lease in controversy without notice of the claims of the plaintiffs in this case or any of them, and did he pay said G. J. Thomason value for the same at the time? Answer: No.

"Did G. W. Thomason, in 1911, purchase from G. J. Thomason one-third of the minerals in and under the land described in plaintiffs' petition for a valuable consideration paid at the time, and without notice of the claims of Mrs. McEntire that she had not willingly executed or acknowledged the lease in controversy? Answer: No.

"Did Y. L. Thomason, in January, 1911, purchase from G. J. Thomason one-third of the minerals conveyed by the lease in controversy without notice of the claims of the plaintiffs in this case, or any of them, and did he pay said G. J. Thomason value for the same at the time? Answer: No.

"Did Y. L. Thomason, in 1911, purchase from G. J. Thomason one-third of the minerals in plaintiffs' petition for a valuable consideration paid at the time and without notice of the claims of Mrs. McEntire that she had not willingly executed or acknowledged the lease in controversy? Answer: No."

The last-mentioned issues requested by the interveners followed and were made subject to the refusal of the court of interveners' request for a peremptory instruction for findings in their favor on those issues.

[1] Counsel for appellees have not seen fit to file briefs in reply to elaborate briefs filed by appellants. In the absence of such reply briefs, we would be authorized to accept appellants' briefs as a proper presenta-

tion of the case without an examination of the record. Rules 40 and 41 (142 S. W. xiv). However, in view of the fact that the jury has found in appellees' favor all issues submitted to them, we have felt it our duty, in justice to them, to examine the record fully, which we have done, and our labors have included the reading of the entire statement of facts. But we do not wish our action in this instance to be taken as a precedent and as an invitation for counsel to thus impose upon this court extraordinary labors which they themselves should perform.

The verdict of the jury imports findings sustaining all of the allegations of fraud on the part of the defendant in plaintiffs' pleadings, and, independent of others of such charges, the evidence was sufficient to sustain the finding that defendant, G. J. Thomason, in order to induce the execution of the instrument in controversy, promised plaintiffs that he would transfer to the Diamond Coal, Oil & Gas Company, a private corporation, all the rights and interest conveyed by that instrument, as well as those acquired by him from other landowners in that vicinity under instruments of like character, and that said promise on the part of the defendant was made by him with no intention to perform it and for the fraudulent purpose of cheating and deceiving the plaintiffs, and that such promise was one of the material inducements which caused plaintiff to execute and deliver the instrument.

[2] The finding by the jury last mentioned, independent of the findings on other issues of fraud, was sufficient to warrant a cancellation of the instrument as against defendant and also interveners if the plea of innocent purchasers by the latter and the defense of limitation urged by the defendant were properly rejected by the jury and trial court. C., T. & M. C. Ry. v. Titterington, 84 Tex. 218, 19 S. W. 472, 31 Am. St. Rep. 39; Cearley v. May, 106 Tex. 442, 167 S. W. 725.

In this connection it is proper to note that the evidence shows that the Diamond Coal, Oil & Gas Company was incorporated under the laws of Arizona; that defendant, G. J. Thomason, held at least $625,000 of the face value of the stock in that company, which was capitalized at $700,000; that at the time of the execution of the instrument the corporation owned practically no assets and has never owned any; that the stock in the corporation was then and is now practically worthless; that on January 11, 1911, the defendant sold to his two brothers, G. W. and Y. L. Thomason, interveners, an undivided interest of two-thirds of all the leases acquired by him from plaintiffs and other landowners in that vicinity, receiving a cash consideration therefor of $2,400; and that he had never transferred to the corporation any of said lease so obtained by him. He did not testify upon the trial of this case, although he was represented by

counsel jointly with the interveners, but certain portions of his testimony given upon a former trial of the case were introduced. In that testimony he stated, in substance, that he had agreed with plaintiffs and the other landowners from whom he obtained leases to transfer all of those leases to the Diamond Coal, Oil & Gas Company, and further testified that he held the same in trust for that company; but he did not offer any reason or excuse for not making the transfers to the company, nor does it appear that he rendered any account to that company for the $2,400 cash received from his brothers for the sale of the two-thirds interest in all those leases. He did testify to the beginning of work on what was called the Ham lease, near plaintiffs' land, prior to his sale to his two brothers. But the evidence further shows that after such sale he, in conjunction with his brothers, carried on the development work on the Ham lease, which resulted in digging two or three holes in the ground in search for coal, one of which extended to a depth of more than 40 feet, about 4 feet square, and at the bottom of which coal was discovered which would be in paying quantities with proper railroad facilities for handling the same, but which facilities have never existed; and, according to the testimony of intervener G. W. Thomason, he and the other interveners paid a large portion, to say the least, of the expense of such development. The evidence warrants the conclusion that after the sale to the interveners they and defendant dealt with the leases under the assumption that the Diamond Coal, Oil & Gas Company had no interest therein.

The finding of the jury that plaintiffs have never received any consideration of value, not even the recited consideration of $1 cash, for the instrument which they executed, is supported by uncontroverted proof, and a tender of a return of their stock was therefore unnecessary.

[3] The evidence was also sufficient to support the finding that when the interveners purchased from the defendant an undivided two-thirds interest in all of the leases, including the lease by plaintiffs, they knew, or by the exercise of reasonable diligence should have known, that one of the considerations for the lease which plaintiffs executed was the promise of the defendant to transfer that and the other leases to the Diamond Coal, Oil & Gas Company, and to give to plaintiffs stock in that corporation at the rate of $5 per acre; that such promise by the defendant was made with no intention to perform it and for the fraudulent purpose of deceiving the plaintiffs and thereby inducing them to execute the instrument. That finding was sufficient to overcome the interveners' plea of innocent purchasers without notice.

[4] Furthermore, we are unable to disturb the finding of the jury that the plaintiffs were guilty of no negligence in failing to discover the fraud practiced upon them by the defendant earlier than two years next preceding the filing of their suit for cancellation. While it is true they could have gone to the deed records of the county and there discovered that no transfer to the oil company had been rendered, yet it cannot be said, as a conclusion of law, that such a discovery, standing alone, as a further conclusion of law, would have made them chargeable with knowledge of the further fact that no such transfer had been executed, and that defendant had never intended to execute one, or that the oil company had never owned any assets. Plaintiff S. J. McEntire was blind, and that he was uneducated is shown by the fact that he signed the instrument with a cross mark, being unable to write his name. Defendant was a boarder at his house when the instrument was executed, and some of his brothers boarded there while development work was in progress. The evidence of the plaintiffs was sufficient to warrant the conclusion that they reposed confidence in the defendant and trusted him to carry out his agreement. While they did testify to an oral promise by the defendant that he would release the lease at any time plaintiffs might desire and that within two years thereafter he declined, upon their request, to do so, yet they further testified that defendant explained to them as his reason for not so doing was, in effect, that he could not do so in justice to the other landowners who had given similar leases for stock in the corporation, which leases were to be transferred to the corporation along with the plaintiffs, and upon the representation that the stock issued to those owners would participate in the benefits of all those leases, including that of the plaintiffs. Apparently the plaintiff decided to accept that explanation by the defendant as reasonable and as satisfactory.

Aside from the facts just related, there was no evidence to suggest to plaintiff that probably the defendant had not complied with his promise to transfer all of the leases to the corporation, and plaintiff S. J. McEntire testified without contradiction that he did not discover that such transfers had not been made until he heard the defendant so testify in court, in August, 1917, on the former trial of this case, that he had not theretofore made such transfers.

In this connection we will add that the statute of limitation of four years, and not the two-year statute, was the only statute that would bar the suit to cancel for fraud, and, while that statute was also pleaded by the defendant, that defense was not submitted to the jury; and, even though it could be said that the finding rejecting the defense of limitation of two years was not supported by the evidence, that would be

no cause for a reversal. Furthermore, interveners filed no plea of limitation at all. Railway Co. v. Titterington, supra; Groesbeck v. Crow, 91 Tex. 74, 40 S. W. 1028.

Further still, in addition to the absence of any finding by the jury sustaining the defense of limitation of four years, appellants have addressed no specific and single assignment to an implied finding by the trial court overruling that defense, and with evidence to support such a finding. The only instance in which it is urged that that defense was conclusively established by proof is in one of 37 separate and distinct propositions submitted under an assignment complaining of the refusal of defendant's request for a peremptory instruction to the jury to return a verdict in his favor as against plaintiffs' entire cause of action, which instruction was properly refused, in view of the evidence sustaining the allegations of fraud, if for no other reason.

[5] And it may be added that, the land being the homestead of plaintiffs at the time the lease was executed, and having been occupied and claimed by them ever since as such, the defense of limitation, under the statute, was not available against the cause of action asserted by Mrs. S. A. McEntire by reason of her coverture. See opinion in Deaton v. Rush (No. 9448), 235 S. W. ——,[1] decided by this court March 12, 1921, not yet published, and authorities there cited.

[6] This is the second appeal of this case, the disposition of the former appeal appearing in 210 S. W. 563. In the opinion rendered on that appeal it was said that the evidence introduced upon the first trial was sufficient to warrant a peremptory instruction in favor of the defendant and interveners on their plea of the statute of limitation of two years. That ruling is invoked as decisive of the same issue on this appeal, upon the doctrine of stare decisis. We have examined the record of the former appeal, and find that the testimony of the plaintiff S. J. McEntire on the first trial was in many particulars substantially to the same effect as upon the last trial. He testified on the first trial that the defendant promised plaintiffs to convey the lease in controversy and all others taken in that vicinity to the Diamond Coal, Oil & Gas Company and had not done so; but the plaintiffs' pleadings, upon which the first trial was had, contained no allegation of any such promise, to say nothing of the absence of a further allegation that it was fraudulently made and with no intent to perform. Hence that issue was not in the case, and what was said upon the issue of limitation on the former appeal is not conclusive on this appeal with respect to that issue, at all events.

In their pleading upon which the case was first tried, plaintiffs proceeded upon

[1] Writ of certiorari pending in Supreme Court.

the theory that, if any statute of limitation applied to their suit, it was the statute of two years, and their briefs filed here on their first appeal were upon that theory, and, under one assignment of error presented, the contention was expressly made and urged that the statute of limitation of four years was not applicable. On the first trial, the trial judge filed findings and conclusions showing a holding that the suit was barred by limitation, but with no showing whether the two-year or four-year statute was intended. Hence the opinion rendered on the first appeal was upon the theory invited and urged by plaintiffs, who were appellants, that the statute of limitation of two years, and not the statute of four years, should govern, without stopping to determine whether or not that theory was correct; and after that opinion was handed down appellants did not file any motion for rehearing.

In their amended petition upon which the case was last tried plaintiffs, as in their former petition, again alleged facts which, if true, would refute the defense of the two-year statute of limitation, apparently upon the theory that that statute was applicable; but on the last trial judgment was rendered in their favor, and not against them, as was done on the first trial, and in order to reverse it, because of a bar of plaintiffs' suit by limitation, it would be necessary for this court to hold that the defense of four-year limitation was conclusively established, and that, too, in the absence of a proper assignment of error presenting that contention, which clearly cannot be done.

From the foregoing conclusions, it follows that the judgment must be affirmed, irrespective of the other issues discussed in appellant's brief, the determination of which, therefore, becomes unnecessary.

Affirmed.

### On Motion for Rehearing.

The contention in appellants' motion for rehearing that the acreage covered by instruments obtained by defendant, G. J. Thomason, from persons other than plaintiffs on the same date aggregated 2,602 acres instead of 1,566 acres, as stated in the original opinion, and that the acreage covered by instruments thereafter obtained by the defendant aggregated 673 acres instead of 593 acres, as recited in the opinion, is not sustained by that portion of the statement of facts cited by appellants. But, in the interest of entire accuracy, we will say that the number of tracts first procured, exclusive of the tract in controversy, was nine instead of six, as recited in the opinion, although there were but six owners of those tracts.

In our opinion on original hearing it was said that plaintiffs alleged in their petition, in substance, that in order to induce

them to execute the instrument in controversy the defendant represented that a certain corporation known as the Diamond Coal, Oil & Gas Company had large financial assets sufficient to develop the mineral resources, and especially the coal, which it was believed. existed in the vicinity of plaintiffs' land. That statement of plaintiffs' allegations was correct as far as it went, but in addition to those allegations, and in connection therewith, it was further alleged in the alternative as follows:

"Or he represented that such a corporation would be formed, and that when formed the same would have large financial responsibility and great financial assets, sufficient to develop the mineral resources, and especially the coal which he believed to exist in said community."

And the opinion on original hearing is now corrected to show such additional allegations in plaintiffs' petition.

The fifth special exception to the petition, found in defendant's answer thereto, reads as follows:

"For his fifth special exception this defendant says that plaintiffs' said petition is insufficient in that their allegations in reference to the alleged fraud practiced upon them by alleged representations on the part of this defendant concerning the organization of a corporation, because such allegations are indefinite, uncertain, vague, and not understandable, in that the said plaintiffs do allege in one breath that such representations were to the effect that such a corporation had already been organized, and in the next breath the allegation appears that such a corporation was to be organized, and the exception of this defendant to said petition is that he is entitled to notice by said pleadings of which form of the dilemma plaintiff will take in the trial of the case. In other words, he must elect whether he will say upon the trial that the defendant represented that said corporation had already been organized or whether he will say that he represented that it would in the future be organized."

The order of the court upon that exception sets out the exception in full and concludes as follows:

"And the court, having heard and duly considered said special exception, is of the opinion that the law is against the same, and therefore the defendant's fifth special exception to the plaintiff's second amended original petition is hereby in all things overruled, to which the defendant then and there in open court excepted."

In their motion for rehearing appellants, after referring to the alternative allegations in the petition noted above, said that—.

"Said exception was sustained by the trial court, which, however, required and permitted plaintiffs to elect upon which of said alternative allegations they would stand and rely, and plaintiffs thereupon elected to stand, upon the allegations to the effect then represented to plaintiffs that such corporation would be creat-

ed in the future, and that, when so organized, it would have such large financial assets," etc.

The correctness of the statement just quoted from the motion is refuted by the order of court, copied above, and we are cited to no other order in the transcript to sustain it, and have found none. Nor have we found in appellants' brief any assignment of error to the ruling of the court on the exception to the petition shown above.

It is also asserted in the motion for rehearing that after the exception to the petition was sustained—

"and in the trial of the case the evidence was accordingly restricted to such representations concerning the future, and the trial court admitted no evidence showing or tending to show that defendant then represented to plaintiffs that such corporation then already was in existence and had large financial assets. In other words, the case was actually tried with the view and upon the theory that the allegations of the plaintiffs concerning such representations relative to such large financial assets were prospective and promissory only, and were not representations as to the existing facts and conditions."

We have found in the transcript and have been cited to nothing indicating any exclusion by the court of evidence to sustain any of those allegations in the petition, in addition to which we find the trial court submits to the jury the following special issue, in which all of plaintiffs' allegations of fraud were included, and in the charge the jury were told:

"You will have with you for your consideration the pleadings in the case, and you will consider the same for a full and complete statement of all of the issues in this case, but you cannot consider them as evidence.

"Issue 1. Did the defendant, G. J. Thomason, by means of fraudulent representations, induce the plaintiffs to execute and deliver the written mineral lease which was offered in evidence in this case, as alleged by the plaintiffs? Answer 'Yes' or 'No.' "

The jury answered the question "Yes."

The plaintiff S. J. McEntire testified in part as follows:

"I will state to the jury just what Mr. G. J. Thomason stated to me when he came to secure this purported contract, just as near as I can. I had a form of contract drawn up there that he read to me and explained to me about it. He said that he was around getting parties to enlist into a company and wanted to get hold of some lands to operate on and he went on and told us as to what their intentions were. He said that the company wanted the lands to operate on to develop the country, and to work on, and that all that would go in with him, that would really have their lands leased and would go in as part of the company and the lands—the stock that we was to get in the company would be $5, a share in the company to the acre, $5 to the acre, and we would go into them; when it was developed.

each man drew in accordance to what he had invested in the company, the stock that he held in it. * * * .

"Relative to what he said about this company as to whether or not it was organized or was going to be organized, it seems like his statement was that it was to be organized, this company, that all that went into it was a part of the company—all that taken stock in with him was a part of the company. He said the capital stock of the company was $700,000.

"Relative to what he said about what property they would have resources or capital to develop the country, well, there was to be a sum set apart, but just exactly what that sum was I could not say, that was to be set apart for the development of the country.

"With regard to what he said about these leases that he was securing there about turning over these contracts to this company that was to be organized, he said the stock would be transferred into the company; I mean the leases would be transferred to the company. * * *

"I believed the statements that he made to me about what was going to be done and about the organization of this company. I supposed he would do what he said. The promises that he made and the statements that he made there induced me to sign this purported contract. I hesitated at first. I told him we had our little place and had just got it paid out and we didn't wish to get entangled into anything at all, and he said more was the reason that I should go in, being in my condition, that in a short time it would enable me to live independently, and I had nothing to risk at all and all to gain. He said I risked nothing at all. That I was putting up what I had against their capital and means to operate. As to whether or not I called his attention to the fact that I was blind, I never told him anything about that. Y hesitated to sign the agreement. I told him I didn't care to go into anything of the kind, that I did not know anything about it and that I was illiterate, unlearned, and a poor man and I didn't want to get my little place entangled in anything at all. He knew I was blind. I never told him anything about it that I remember. I was blind, and he knew I was blind before he came."

The statement of facts fails to show any testimony from G. J. Thomason, or any other witness, contradicting that testimony of S. J. McEntire. Furthermore, appellants' only assignment of error to the first issue submitted by the court does not present the contention embodied in the special exception above. That assignment reads as follows:

"The court erred in overruling defendant's objection to the first special issue submitted, the same being found in subdivision 1 of the objections made to the court's charge, this objection being in words and figures as follows: 'Defendant objects to the first special issue submitted for the reason that there is no evidence to authorize the submission of said issue, and for the further reason that the court does not define nor instruct the jury what fraudulent representations are referred to in said first special issue, and because, further, the answer of said special issue in the affirmative would not justify or support any judgment in favor of the plaintiffs, because it would not show that the plaintiffs relied upon said representation and believed the same to be true, and because, further, it is shown by the positive testimony of the plaintiff that he did not rely upon said representation, but testified only upon insistent examination by his counsel that he supposed the same was true."

It is insisted that there was no evidence to show that on August 18, 1909, when the instrument in controversy was executed, the Diamond Coal, Oil & Gas Company had then been organized or chartered, and hence there was no proof to sustain the allegation to the effect that it then had no assets. And in this connection the following is said in the motion for rehearing:

"Parenthetically to this assignment, may we not suggest that on August 18, 1909, the Diamond Coal, Oil & Gas Company had not been organized or created, and that its articles of incorporation had not been filed, and that said articles of incorporation were filed subsequently, and that the charter of said corporation was granted by the state of Arizona at a still later date, to wit, August 24, 1909."

But the motion contains no reference to any evidence in the statement of facts to support that statement, and we have found none; hence we decline to give it any weight. Moreover, it was immaterial to plaintiffs' right of recovery that the fraudulent scheme alleged consisted of misrepresentations by the defendant of his intention to organize and charter a corporation which would have large financial assets, to be used in the development of the mineral resources of the land, rather than that such corporation had been already formed and then possessed such assets, if such representations were made with intent to deceive and defraud plaintiffs and with no intent to perform such a promise.

It is insisted further that this court erred in holding that the evidence showed that the stock of the Diamond Coal, Oil & Gas Company is practically worthless, and that we were in error in the statement that the defendant, G. J. Thomason, now holds in trust for the Diamond Coal, Oil & Gas Company an undivided one-third interest in the leases obtained by him from plaintiffs and the other landowners in that vicinity. The testimony of plaintiff McEntire was to the effect that the Diamond Coal, Oil & Gas Company had nothing that he could learn of. It was shown without controversy that none of the leases, or any interest therein, have ever been transferred to that company. Appellant G. W. Thomason, one of the interveners herein, testified on the trial as follows:

"So far as I know, there has never been any transfer of these leases to the Diamond Coal, Oil & Gas Company. I have no knowledge of

that at all. Relative to what the assets of the Diamond Coal, Oil & Gas Company, it had whatever interest, according as I understand it, that they had this property that went in as part of those assets. I do not know of anything else that it had."

Portions of the testimony of G. J. Thomason given on the former trial as shown in the stenographer's transcribed notes were read. He testified in part as follows.

"I have never transferred out of my name the leases or mineral rights. They still stand in my name. I have never transferred any of that to the company. * * * I own about 500—about 640,000 or 625,000 shares of the stock of the Diamond Coal, Oil & Gas Company. The entire capitalization of the company was $700,000. I paid quite a bit for that 625,000 shares of stock in the company."

Examined by the court:

"If I understand what you mean, I paid no cash consideration for it.

"Q. What did you pay for that 625,000 shares that you got from the Diamond Coal, Oil & Gas Company. A. At the time of the organization, right at that time?

"Q. What did you pay for it at the time you came in possession of it? A. Well, there was development work that was to be one of the means of payment. That was to be paid. That was a part of my obligation. With regard to whom I paid that, I paid that to the development work, the development of this stock.

"Q. Well, who did you pay it to? A. That was the obligation I taken on myself that I was to do that. When we organized, $700,000 was the amount of shares of the capital stock of this corporation. This was the paid up capital stock. I do not know what that 700,000 shares, capital stock was paid in; I don't get your meaning, Judge. Relative to what we paid to get that charter when we organized this corporation, that was not organized in this state, and under the laws of Arizona we simply pay for the charter and organization. I do not remember how much we paid for the charter. As to whether or not I could give you some idea of what was paid for the charter, I do not remember. About $100, I judge, was the amount. That did not constitute what was paid for the 700,000 shares of stock. Relative to what else I paid for the $700,000—700,000 shares of stock in the beginning—well, in the beginning the stock was not considered to be worth much. I never considered that the stock amounted to practically nothing. That stock was a representation of each man's interest in the proposition. * * * As to whether or not I considered the stock worth nothing, well in one sense I did not consider the stock as being worth very much. Of course it was worth something yet at that time we did not consider that it was worth a great deal. With regard to what it was worth, that taken as a representative, I would say between five or ten dollars."

[7] We have found no other evidence in the record as to the value of the stock, and we think the testimony quoted amply supports the conclusion reached that the stock in the Diamond Coal, Oil & Gas Company, which,

plaintiffs received for the lease in controversy, was and is practically worthless. There was no other evidence to show a single transaction by the officers of the corporation, or that it has kept up its legal existence, or that it in fact owns a single dollar of assets. If the corporation is not defunct, or if it owns any assets whatever, such facts are positively within the knowledge of defendant, who holds practically six-sevenths of the stock, and he should have made proof of such facts, if any, to rebut, to say the least, the prima facie showing of an entire lack of assets, or else defendant should have shown some reason why he could not produce such proof. The defendant, G. J. Thomason, further testified as follows:

"Relative to whether or not I own these mineral rights now, they are held in trust by me.

"Q. Do you own these mineral rights personally? Answer that question 'Yes' or 'No.' A. I own my interest in it. The interest that I have in the mineral rights of the McEntire land in this one case would be designated by the amount or between that part of the land; would be the pro rata to the whole and to the amount of stock that Mr. McEntire owns as to the whole amount of the stock of the corporation."

We construed the first statement in connection with the further answer of G. J. Thomason, quoted, to mean that he now holds the unsold one-third interest in the leases mentioned above in trust for the Diamond Coal, Oil & Gas Company. However, appellants now insist that that conclusion was incorrect. As to this, it is sufficient to say that, if our construction of that testimony was incorrect, the error was certainly more favorable to the defense urged against the allegations of fraud, which the jury sustained.

Appellants' motion for rehearing embodies a quotation from briefs filed by McEntire on the former appeal to show error in the recitals in the opinion on this appeal to the effect that plaintiffs' pleadings upon which the case was first tried contained no allegation of a promise by defendant to convey the lease in controversy to the Diamond Coal, Oil & Gas Company. Appellants do not quote from the pleadings, a copy of which is on file in this court, and presumably the original one on file in the trial court, but from an assignment of error appearing in the briefs. To copy those pleadings in full in this opinion would unduly lengthen it. We have again examined them, and find that they sustain what we said in our original opinion on this appeal.

Another criticism of the original opinion on this appeal is as follows:

"The Court of Civil Appeals erred in finding and in holding and in declaring in its opinion that the written conveyance of August 18, 1909, from plaintiffs to defendant, G. J. Thomason,

embodied a clause reading: 'Reserving, however, to the heirs of first party their proportionate part of cash dividends'—the corresponding clause in said conveyance being in fact as follows: 'Reserving, however, to the parties of the first part their proportionate part of the cash dividends.' In other words, instead of the word 'heirs,' said conveyance uses the word 'parties.' In reply to that criticism, we will say that the instrument in controversy was copied in full in the opinion, and, as copied, shows the exact language: 'Reserving, however, to the parties of the first part their proportionate part of the cash dividends,'" etc.

And in no part of the opinion have we been able to find any statement to the contrary. But, even if there had been, the language of the instrument itself would control.

The statement in the original opinion that the evidence showed that defendant, G. J. Thomason, was a boarder in plaintiffs' home when the instrument in controversy was executed was erroneous, and it is withdrawn. But plaintiffs both testified without contradiction that he boarded with them when the development work on the Ham lease was in progress, under the defendant's direction and management. Plaintiffs' confidence in defendant at that time bore more materially upon the issue of plaintiffs' failure, sooner to discover the fraud alleged, which was involved in the defense of limitation.

We adhere to the conclusions reached that the evidence amply supports the findings of the jury on the issues heretofore discussed, and are of the opinion that upon those issues the judgment of this court heretofore rendered was correct, irrespective of the further finding by the jury that the rights originally acquired under and by virtue of the instrument in controversy have been abandoned; and the merits and effect of which finding, under the pleading upon which it was based, therefore, will not be determined, because unnecessary.

The motion for rehearing embodies 93 grounds, in addition to which, appellants have filed two separate typewritten arguments, one of 28 pages and the other of 14 pages, and in one of the written arguments it is said:

"It is very apparent from the findings, conclusions, statements, and remarks of this court in its opinion in this case that this court has dipped its brush into the wrong coloring and given to the facts in this case a coat of coloring which they do not deserve. We earnestly insist that this court carefully review this case and correct a number of its findings which will hereafter be pointed out in the different parts of the court's opinion."

In order to properly answer that criticism, we have been compelled to make these conclusions much longer than is usual in disposing of a motion for rehearing. But the unusual length has been caused chiefly by a plain violation on the part of appellants' counsel of rule 31 (142 S. W. viii), governing procedure in the Courts of Civil Appeals, which requires that statements of proceedings shown in the record shall be made faithfully and upon the professional responsibility of the counsel who makes them; and it is apparent that the violation of that rule was due to the failure of counsel to carefully study the record as they should do, before indulging in such criticism of this court.

The motion for rehearing is overruled.